Filed 4/22/15  P. v. Davis CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>BERNICE QUEENETHEL DAVIS,<br><br>    Defendant and Appellant. | B252393<br><br>(Los Angeles County<br>Super. Ct. No. MA055301)<br><br>ORDER MODIFYING OPINION AND DENYING PETITION FOR REHEARING<br><br>[No Change in Judgment] |

THE COURT:

It is ordered that the opinion filed herein on March 30, 2015, be modified in the following manner:

In the last paragraph on page 7, the sentence in parenthesis beginning with (The information alleged one date range for counts 1 and 2 . . . .) is revised to read: (The information alleged one date range for counts 1 and 2 and a different date range for counts 3 and 4, but nothing in the record indicates that the jury was given a copy of the information, which was merely read aloud during jury selection.)

This modification does not constitute a change in the judgment.

The petition for rehearing is denied.

<u>NOT TO BE PUBLISHED</u>.

_____

ROTHSCHILD, P. J.         CHANEY, J.         BENDIX, J.[*]

---

[*]    Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Filed 3/30/15 (unmodified version)

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>BERNICE QUEENETHEL DAVIS,<br><br>    Defendant and Appellant. | B252393<br>(Los Angeles County<br>Super. Ct. No. MA055301) |

APPEAL from a judgment of the Superior Court of Los Angeles County.  David Walgren, Judge.  Affirmed, modified, and remanded with directions.

———

Thomas T. Ono, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, David C. Cook, and David A. Wildman, Deputy Attorneys General, for Plaintiff and Respondent.

———

Bernice Queenethel Davis was convicted of the child abuse homicide of her two-year-old son, A.M., and related offenses. We conclude that her sentence on one count should have been stayed and that she received an incorrect number of days of presentence custody credit. We otherwise affirm.

BACKGROUND

The information charged Davis with one count of murder in violation of Penal Code section 187[1] (count 1), one count of assault on a child causing death in violation of subdivision (a) of section 273ab (count 2), and two counts of child abuse in violation of subdivision (a) of section 273a (counts 3 and 4). It further alleged as to all counts that they were serious or violent felonies or offenses requiring registration under section 290, subdivision (c), and that prison custody time for the charged offenses must be served in state prison pursuant to section 1170, subdivision (h)(3).

Davis pleaded not guilty and denied all allegations. The charges were tried to a jury, which found Davis guilty as charged on all counts. The court sentenced her to 31 years to life in state prison, calculated as follows: 25 years to life as to count 2, plus 6 years as to count 3. The court also imposed sentences as to counts 1 and 4 but stayed them pursuant to section 654, imposed various statutory fines and fees, required Davis to provide DNA samples, and credited her with 542 days of presentence custody. Davis timely appealed.

The evidence introduced at trial showed the following facts: Shortly after 8:00 p.m. on January 26, 2012, Davis's nine-year-old daughter called 911 to request an ambulance because her two-year-old brother, A.M., would not wake up. (She also told the 911 operator that there were three adults present.) Sheriff's deputies arriving at the scene found A.M. not breathing and rushed him to the hospital, performing CPR on the way. Upon arrival at the local hospital, A.M. was cold and slightly bluish, was not breathing, had no pulse, and had no electrical activity in his heart, so he was clinically dead. Hospital staff were able to restart his heart and stabilize him sufficiently for air

---

[1] All subsequent statutory references are to the Penal Code.

transport to another hospital that had a pediatric intensive care unit. He was still critically ill upon arrival at the second hospital, where the staff tried to stabilize him sufficiently for surgery. The staff's efforts were not successful, and A.M. died at approximately 5:00 a.m. on January 27, 2012, before they could get him to the operating room.

The coroner performed an autopsy on January 30, 2012, which revealed that A.M. had recently suffered numerous internal injuries. Both of A.M.'s wrists were fractured; the coroner estimated that those injuries were 2 to 13 weeks old. A.M. also had six fractured ribs, also estimated to be 2 to 13 weeks old; one of the ribs also showed that it had been refractured eight times. The coroner found all of these injuries to be suspicious for multiple reasons—such injuries were unlikely to be produced by accident in a child so young because, for example, "a two-year old is not tall enough and wouldn't be typically engaging in activities that would generate enough force to fracture the wrist." As for the broken ribs, "[i]n an accident, such as like a high speed motor vehicle accident or falling from a significant height, like more than 10 feet high, . . . you could get a rib fracture. But you would not expect as many. You know, maybe one or two. But there are six of them, and they are also located at the back which is not a very common area for a child to accidentally injure themselves."

The coroner also found severe injuries to multiple abdominal organs. A.M.'s proximal duodenum (the first part of the small intestine), which attaches to the stomach, "was completely severed." As a result of that injury, stomach contents containing bacteria leaked into A.M.'s abdominal cavity, causing infection. A.M.'s pancreas was also "cut in half" ("the head of the pancreas was . . . transected"). In addition, the coroner identified injury and bleeding into A.M.'s transverse mesocolon (tissue that attaches the middle part of the large intestine to the back wall of the abdomen) and mesentery (tissue that attaches the small colon to the wall of the abdomen). There was also bleeding into and around A.M.'s adrenal gland and bleeding in the right kidney.

The coroner opined that to cause such injuries would require a "violent compressive force" of sufficient magnitude to press the front abdominal wall "in all the way to the back bone. And when that happens, the organs that are in between the

abdominal wall and the back bone get squeezed and transected, or cut." A light punch or kick would not be sufficient, but a hard punch or kick would be. Neither CPR nor any of the medical treatments that A.M. received could have caused A.M.'s organ injuries. The organ injuries caused A.M.'s death by causing an abdominal infection that eventually led to septic shock. In a two-year-old child, such injuries would be expected to lead to death within three to four days, though it could be as little as "20 hours or so, 18 hours."

Davis was interviewed by the police on January 27, 30, and 31, 2012. In the first interview (which preceded the autopsy), she denied that she ever hit her children, grabbed them hard, or shook them. In the second interview, Davis stated that they were not in a car accident, a bicycle accident, or any kind of accident in the last week, nor had A.M. fallen out of a wagon going at a high rate of speed, and she again insisted that she "never hit him." In the third interview, Davis at first continued to claim that she "didn't hit him," but she eventually admitted "of course, I hit all the kids" but still claimed she "never hit [A.M.] within that week." Eventually, she admitted, "Yeah, I did hit him a lot of times," and "Maybe I did hit him and hit him too hard, because I'm his mom." Later, when the police officer suggested that "[s]ometimes, we react and grab things harder than we mean to," Davis responded, "That's what I'm saying. That's what happened in this case," and "It was an accident." Davis repeated these themes several times throughout the remainder of the interview (e.g., "I done hit they ass a lot of times"; "it was a little bit too hard"; "It was a big accident. It was a big mistake."). She also said, "Yeah, I kicked him one time." When the police officer said, "You'd have to have – you'd have to have some force to it. It couldn't have been, like a little light –" Davis interjected, "I never said it was."

## DISCUSSION

### I.    Substantial Evidence

Davis argues that the record does not contain sufficient evidence to prove (1) that she harbored the necessary mental state for second degree murder, (2) that she harbored the necessary mental state for child abuse homicide, and (3) that she was the perpetrator of the child abuse charged in counts 3 and 4. We disagree.

The record contains substantial evidence (namely, Davis's police interviews and the coroner's testimony) that Davis hit or kicked A.M. with sufficient force to cause the severe abdominal injuries that killed him. The jury could reasonably infer from that evidence that Davis performed an act whose natural consequences were dangerous to life and that she must have (1) known that hitting or kicking two-year-old A.M. that hard endangered his life and (2) acted with conscious disregard for life. That is sufficient to show implied malice, the mental state required for second degree murder. (See *People v. Bryant* (2013) 56 Cal.4th 959, 964-965.) Davis used force that a reasonable person would know was likely to produce great bodily injury, which is the mental state required for child abuse homicide. (See *People v. Malfavon* (2002) 102 Cal.App.4th 727, 735.) Davis argues that under *People v. Collins* (1961) 189 Cal.App.2d 575, 591, "[t]he prosecution, having presented as a part of its case the statement of defendant as to how the killing occurred, is bound by that evidence in the absence of proof to the contrary." She contends that "her admissions do not show an actual awareness that her conduct endangered the life of her son," and she concludes that under *Collins* we are required to infer that she lacked the requisite mental states for second degree murder and child abuse homicide. We are not persuaded. Given A.M.'s age and the coroner's testimony concerning A.M.'s appallingly severe injuries and how they must have been caused, the jury could reasonably infer that Davis must have been aware that her conduct was likely to produce great bodily injury and endangered A.M.'s life, and that Davis consequently acted with conscious disregard for life. A reasonable person would know that this conduct would be likely to produce great bodily injury.

As regards counts 3 and 4, Davis argues that because the evidence shows that A.M. was not continuously in her custody during the time in which he suffered the broken wrists and broken ribs (2 to 13 weeks before he died), the record does not contain substantial evidence that she inflicted those injuries. We are not persuaded. The evidence shows that before October 2011, A.M. lived with his father but sometimes visited Davis. In October 2011, A.M.'s father was incarcerated on a drug charge, and A.M. stayed briefly with A.M.'s father's then-girlfriend before going to live with Davis.

Davis stated in a police interview that A.M. was in her care ever since then, with the exception of six of seven days, possibly in November, when A.M. was again with his father's girlfriend. But Davis said that A.M. was "in good condition" when he returned. A witness at trial also testified that before Davis got A.M. back from his father, A.M. had a "scald" on his hand (apparently from hot water), but when she last saw him alive, at the end of October 2011, he appeared to be "fine," did not show signs of being in pain when she picked him up, did not show signs of being in pain when using his arms, and in general "was the happiest baby." In view of this evidence, the jury could reasonably infer that (1) A.M. did not have broken ribs or broken wrists when he entered Davis's custody, and (2) he was "in good condition" when he returned to her after a brief stay with his father's girlfriend, so (3) he must have suffered those broken bones while in Davis's custody, and (4) Davis must have caused those injuries herself, having admitted that she "hit him a lot of times." The record therefore contains substantial evidence that Davis, rather than someone else, was the perpetrator of the child abuse charged in counts 3 and 4.

II.     Failure to Instruct on Unanimity

Davis argues that because the prosecution presented evidence of more than two acts of child abuse but charged only two counts of child abuse (counts 3 and 4), the court had a sua sponte duty to instruct the jury that it could not convict her unless it reached unanimous agreement on which acts she committed. Assuming for the sake of argument that the court erred, we conclude that the error was harmless beyond a reasonable doubt. (See *People v. Milosavljevic* (2010) 183 Cal.App.4th 640, 647 [holding that failure to instruct on unanimity is reviewed for prejudice under the standard of *Chapman v. California* (1967) 386 U.S. 18, but acknowledging a split of authority on the issue].)

"Where the record provides no rational basis, by way of argument or evidence, for the jury to distinguish between the various acts, and the jury must have believed beyond a reasonable doubt that defendant committed all acts if he committed any, the failure to give a unanimity instruction is harmless." (*People v. Thompson* (1995) 36 Cal.App.4th 843, 853.) Here, the record provides no rational basis, by way of argument or evidence,

for the jury to distinguish between the various acts of child abuse (the broken wrists, the broken ribs, and the fatal abdominal injuries). The uncontradicted statements of Davis and the uncontradicted testimony of a trial witness confirm that A.M. was not suffering from those injuries when he last entered Davis's custody. Davis admitted hitting him repeatedly and kicking him, and there is no evidence that the injuries might have been inflicted by someone else or caused in some other way. We accordingly conclude that any error in failing to give a unanimity instruction was harmless beyond a reasonable doubt.

III.    Multiple Punishment for the Same Act

As noted earlier, the trial court sentenced Davis to 25 years to life as to count 2 and 6 years as to count 3, and the court imposed but stayed sentences as to counts 1 and 4 pursuant to section 654. Davis argues that the sentence as to count 3 should have been stayed pursuant to section 654 as well. Respondent counters that because the fatal abdominal injuries underlying count 2 were inflicted at most four days before A.M. died, and the broken wrists and broken ribs were inflicted at least two weeks before he died, the acts of abuse that caused those two sets of injuries were separate acts and hence can be punished separately. We disagree with respondent, because nothing in the jury instructions or verdict forms required the jury to base the convictions in counts 2 and 3 on separate acts. (The information alleged one date range for counts 1 and 2 and a different date range for counts 3 and 4, but nothing in the record indicates that the jury was given a copy of the information.) Because the convictions on counts 2 and 3 therefore might have been based on a single act (namely, whatever blow caused A.M.'s fatal abdominal injuries), section 654 prohibits punishing Davis for both of them. Davis is therefore correct that the sentence as to count 3 should have been stayed.[2]

_____

[2] Because of our resolution of this issue, we need not address Davis's additional argument that the sentence as to count 3 should be stayed because it was based on improper factual findings by the trial court.

IV.    Custody Credit

The court credited Davis with 542 days of presentence custody.  Davis contends that it should have been 550 days.  Respondent concedes the error, and we agree.  We therefore direct the trial court on remand to credit Davis with 550 days of presentence custody and to prepare a new abstract of judgment reflecting that change.

## DISPOSITION

The trial court is directed to stay the sentence as to count 3 pursuant to section 654 and to credit Davis with 550 days of presentence custody.  The judgment is otherwise affirmed.  The trial court is directed to prepare a new abstract of judgment and forward a certified copy to the Department of Corrections and Rehabilitation.

NOT TO BE PUBLISHED.


                                        ROTHSCHILD, P. J.
We concur:



        CHANEY, J.



        BENDIX, J.*

---

\*      Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.